**LAMM v. CHAMBERS et al.** (No. 8237.)

Court of Civil Appeals of Texas. San Antonio.
May 29, 1929.

Hugh R. Robertson and W. C. Douglas, both of San Antonio, for appellant.

Cunningham, Moursund & Johnson and Joseph Ryan, all of San Antonio, for appellees.

FLY, C. J. This is a suit by appellant, describing himself as "a resident citizen of the city of San Antonio, in Bexar county, Tex., and owns both real and personal property within said city to the value of at least $10,000," and that he is a taxpayer. The suit is against C. M. Chambers, mayor, and Phil Wright, Jacob Rubiola, Paul Steffler, and Frank H. Bushick, commissioners of the city of San Antonio, who constitute the governing body thereof, and J. Depuy; and the object of the suit was to obtain a writ of injunction restraining the city and its officers from applying or disbursing any part of the $1,250,000 arising from the sale of bonds which were voted by the citizens of San Antonio for the purpose of constructing "a permanent system of sewerage disposal, and permanent sanitary sewers and drains, and acquiring any parcels of land, which may be necessary therefor," for the purchase of a "sewage treatment works, a sewage treatment or disposal plant of any kind, or to the purchase of any land for such purpose." The allegations in short, represent that a valid contract was entered into by the city with R. H. Russell and J. A. Simmons and associates, in 1901, for the purpose of disposing of the sewage of the city of San Antonio at and into Mitchell Lake, and that the contract had been executed for a term of 99 years. It was alleged that the contract with the city was transferred and assigned to the San Antonio Irrigation Company, Sydney J. Brooks, Ed-

ward Cassin; Mrs. Charlotte Cassin, and Mrs. Cora Ogden. It was also alleged:

"That for a period of more than 25 years, the parties aforesaid carried out the duties and obligations assumed by them under said contract and received the benefits thereof, said benefits consisting of practically free irrigation for the lands owned by them surrounding and in the vicinity of said Mitchell Lake, but some two or three years ago said parties began neglecting their duties and failed to properly dispose of said sewage with the result that complaints were made to the city by persons residing along the San Antonio and Medina Rivers that said streams were being polluted by sewage from said lake; that the mayor of said city advised said parties of such complaints and insisted that they comply with their contract, but said parties continued to fail and refuse to comply with said contract, whereupon John W. Tobin, then mayor of said city, directed the city attorney to file suit against said parties to compel them to carry out their obligations under said contract, and said suit was duly filed in the thirty-seventh district court of Bexar county."

It was alleged that the city had filed a suit for specific performance of the contract, and that in answer to certified questions the Supreme Court had held the contract valid and of such a nature as that specific performance of its provisions can be obtained in the courts. It was claimed that the present disposal of sewage in Mitchell Lake, carried out according to the terms of the contract, would answer every need until the end of the contract. Sum and substance of the allegations are that the present sewage disposal system at Mitchell Lake is all-sufficient for the needs of the city during the further 70 years of the existence of the contract, and that the city can force the specific performance of that contract, and that the disbursement and expenditure of over a million dollars for another sewage disposal plant is unnecessary and a waste of the people's money. A general demurrer to the petition was sustained by the court.

The present sewage system was operating and the suit for the specific performance of the contract was pending when the question was submitted to and voted upon by the voters of San Antonio, as to the acquisition of land necessary to construct "a permanent system of sewage disposal," and the issuance of bonds in the sum of $1,250,000 to carry into execution the design, was approved by a majority of the votes cast. It may be true, as alleged by appellant, that "only a small percentage of the qualified electors of said city voted," but that does not militate against the fact that an election was held, at which every qualified voter had the opportunity to cast his ballot, and that every voter was given notice that it was desired to issue

214

over a milion dollars' worth of bonds to raise money to be invested by the city administration, not in repairing the old system of sewage, but for the purpose of constructing "a permanent system of sewerage disposal * * * and acquiring any parcels of land which may be necessary therefor." The people of San Antonio knew that the city had no "permanent system of sewerage disposal" of its own, and that the efficient disposal of the sewage depended on the efficiency of a corporation not controlled by the city. They were charged with the knowledge of the offensive and unhealthful offal and filth that was escaping from Mitchell Lake and that people for miles down the San Antonio river were complaining of pollution of the stream and threatening suits for damages against the city. In other words, when the bonds were authorized, the people knew that they were clothing their mayor and commissioners with authority to build a new system of sewage disposal. City of Austin v. Nalle, 85 Tex. 520, 22 S. W. 668, 960. The authority given by the people is broad and comprehensive, amply sufficient to justify every step that appellant alleges has been taken by the governing body of the city of San Antonio. It may possibly be that the city authorities have evolved a scheme for "a permanent sewerage system" that does not meet the approval of appellant and others of the taxpayers of the city, but that disapproval must be expressed through the ballot box and not through a court of equity. It is judicially known to this court that an opportunity for expressing such disapproval has been offered only a few days since, and by a heavy, practically unanimous vote the acts of the administration were approved. The mayor and commissioners have, under the allegations of the petition, acted strictly within the scope of the authority granted to them by the people in selling the bonds and entering into a contract with Depuy to build a new plant.

■ The power granted the commission to construct a permanent sewage system was general in its terms, without indicating or directing that such duty should be performed in any certain manner, and without being "accompanied by any prescribed mode of exercising it." They were empowered to buy the land and construct the system, and, as said in Dillon, Municipal Corporations, § 242: "In such cases the common council, or governing body, necessarily have to a greater or less extent, discretion as to the manner in which the power shall be used. This discretion, where it is conferred or exists, cannot be judicially interfered with or questioned except where the power is exceeded or fraud is imputed and shown, or there is a manifest invasion of private rights. Thus where the law or charter confers upon the city council, or local Legislature, power to determine upon the expediency or necessity of measures relating to the local government, their judgment, upon matters thus committed to them, while acting within the scope of their authority, cannot be controlled by the courts. In such case the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers." Fraud is not alleged in this case, and under the broad authority given by the people in voting the bonds, there is no indication of their powers being transcended. The bonds were permitted for immediate relief from the ills attending the old system, and with no desire indicated that the great and growing needs of a population of hundreds of thousands should await the actions of courts and "laws' delays" while health and sanitation were being endangered. The people empowered the governing body to act without reference to the answer of the Supreme Court to a certified question, or the ultimate result of a lawsuit between the city and a corporation that had assumed the responsibility of supplying an adequate sewage disposal system for the city. The authority was independent of and superior to any decision in any case then pending.

■ Special power is given by the charter to the commission to establish, erect, construct, regulate, and keep in repair sewers of the city, and, even in the absence of the special authority given by the vote for the bonds, the discretion as to manner and means of establishing, erecting, constructing and regulating the sewers would be lodged in the discretion of the governing body, and the exercise of that discretion would not be interfered with by a court of equity in the absence of fraud or gross misapplication of funds. Where a municipal corporation is intrusted with the execution of a power, and is not confined to a particular mode, but has a discretion in the choice of means, a plain case of the abuse of the discretion resulting in direct injury to the petitioner must be clearly shown in order to warrant the issuance of an injunction against the corporation. Note to section 242, Dillon Municipal Corporations; Union Pac. R. Co. v. Cheyenne, 113 U. S. 516, 5 S. Ct. 601, 28 L. Ed. 1098; Poillon v. City of Brooklyn, 101 N. Y. 132, 4 N. E. 191.

It may not be a wise measure to construct and install a new disposal plant, as alleged by appellant, but it is not for courts to sit in judgment on the wisdom of municipal governments in making improvements, which the charter and direct vote of the citizenship has empowered them to make. As said in City of Austin v. Nalle, herein cited: "Having a plain proposition submitted to them, the voters must be presumed to know its meaning and effect, and to act at their peril; and in the absence of bribery or other like corrupt influence, in a proceeding affecting the validity of the election, no inquiry as to their motives can be permitted." In voting the bonds in this case the voters gave full power to the city government to acquire another sewage disposal plant, and no individual citizen or

numbers of them can set up his or their opinion against the wisdom and discretion of the mayor and commissioners and invoke the aid of the courts of the state to sustain a private grievance and destroy the work of the governmental agency. As said in Pomeroy, Equity Jurisprudence, § 1765: "The court will not interfere whether they are acting wisely or judicially. Wherever legislative power is conferred upon an incorporated city by the state, it is necessary that a degree of freedom should be allowed in its exercise; otherwise the city would be so hampered in the government of its people as would defeat the very ends of its incorporation." Along the same lines it is said in High on Injunctions, § 785: "No principle of equity jurisprudence is better established than that the courts of equity will not sit in review of the proceedings of subordinate political municipal tribunals, and that, where matters are left to the discretion, the exercise of that discretion in good faith is conclusive, and will not in the absence of fraud be disturbed." If the power was invested in the individual, no matter how much wiser he might be than the constituted authorities, to control the affairs of a municipality through injunctions, chaos would result and all efficient municipal government would be destroyed. No fraud is alleged in the petition, and, as said in McQuillan Municipal Corporations, § 379: "In the absence of such fraud, oppression or abuse, action on the part of the municipal authorities is conclusive upon the courts; hence in such case the only question for judicial cognizance, according to certain decisions, is whether there has been any violation of legal principles or neglect of prescribed formalities in entering into the engagement which is the subject of the controversy.

"The rule announced by judicial decisions appears to be that the fraud that will justify interference by the courts is not where the power exercised has resulted in an individual hardship in its execution, or that an individual burden has been imposed without a corresponding benefit conferred, but only in those cases when the act of the municipal body is so unreasonable, oppressive, and subversive of the rights of the citizen in the general purpose declared as to indicate clearly and leave but one inference, that of an attempted abuse rather than the legitimate use of a power enjoyed." The governing body of the city of San Antonio has been given full power to act in the matter of sewage disposal, and its discretion, and not that of the courts, must govern.

The petition fails to state grounds for the exercise of judicial action in controlling the authority of the city commission, the general demurrer was properly sustained, and the judgment will be affirmed.